**In re Robert L. McGINLEY.**

No. 81–502.

United States Court of Customs and Patent Appeals.

Oct. 1, 1981.

Don B. Finkelstein, Los Angeles, Cal.; for appellant.

Joseph F. Nakamura, Sol., Fred E. McKelvey, Associate Sol., Washington, D.C., for Patent and Trademark Office.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MILLER, Judge.

This appeal is from a decision of the Patent and Trademark Office ("PTO") Trademark Trial and Appeal Board ("board"), reported at 206 USPQ 753 (1979), affirming the examiner's rejection of appellant's applications to register a trademark and service mark on the basis that it comprises "immoral . . . or scandalous matter" within the meaning of section 2(a) of the Lanham Act.[1] We affirm.

## BACKGROUND

The involved mark comprises a photograph of a nude man and woman kissing and embracing in a manner appearing to expose the male genitalia.[2] According to the applications for registration, it is used for "Newsletter Devoted to Social and Interpersonal Relationship Topics" and "Social Club Services." The evidence shows that the newsletter has to do with discussions of sexual topics such as bisexuality, homosexuality, masturbation, and fornication; that the services include sponsoring and arranging parties for "swinging," which appears to be a form of group sex.[3] Initially, the PTO examiner refused registration under section 2(a) on the basis that "[t]he mark indicates that the newsletter deals with illicit sexual intercourse" and that "[t]he mark indicates that the services deal with illicit sexual intercourse." Later, the examiner requested that appellant submit additional evidence, saying: "From the specimens submitted it can not be determined, in exactitude, the services performed by applicant. The mark, in relation to the services, may or may not be immoral or scandalous." After considering the additional submissions, the examiner finally refused registration on the basis that appellant's services involve "various 'mini-affairs' between two unmarried people; sometimes two or more unmarried people." He declared: "Such *activities* are considered deviations from the sexual norm of husband and wife relations. Such *activities* are immoral or scandalous. . . . The mark graphically indicates the activity carried on in applicant's Club; sex not normally sanctioned by (even today's permissive) social standards." (Emphasis supplied.)

1. 15 U.S.C. § 1052 provides in pertinent part:
   
   Trademarks registrable
   on principal register;
   concurrent registration

   No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—
   (a) Consists of or comprises immoral, deceptive, or scandalous matter . . . .

2. In his final rejection, the examiner stated that "[t]he mark in use . . . show[s] the genitalia of the man." In his brief before the board, appellant responded: "At the very most, the 'genitalia' of the male depicted on the mark are virtually completely hidden and not disclosed. Only a small portion which could even arguably be considered as the 'genitalia' are shown . . . ."

3. Appellant's newsletter defines "swinging" as . . . "social-sexual relational recreation". This is a more accurate term than "group sex" and serves to better define what swinging is.
   :Swinging is a recreation; a pastime, diversion, refreshment, an agreeable exercise.
   :Swinging is relational; an emotional, physical, involvement or association between people.
   :Swinging is sexual; all aspects of our sexuality—mental, emotional, physical, fantasies, and desires—are involved.
   :Swinging is social; a friendly companionship or relationship between people.
   All are involved in social-sexual activity in our society. In one view, swinging can be considered as only a matter of degree of social sexual involvement. It is not an esoteric practice of the elite, the jet-set, or the degenerate few.
   Another newsletter indicates that "[l]oosely defined, swinging is sexual interaction among humans outside a strict monogamous sexual exclusivity between two partners in a committed relationship."

The board affirmed the examiner's decision, but took two different approaches. First, it considered that the newsletter and services (as broadly described in the applications) [4]—

could appeal to, be offered to, and be read or used by every person in the United States from the age of about six years up. . . .

. . . could be sent to youngsters just learning to read, to teenagers, to senior citizens, to persons of strong moral and religious convictions, to members of the clergy, and to an uncountable number of other persons in the large and varied population of the United States.

. . . could be intended for those who are interested in improving themselves or society in a variety of ways and to those who seek the company of others simply for the comfort of companionship, or to pursue hobbies, or to provide philanthropic or social services to their communities, or to educate and train others (including young people), or for a myriad other purposes, all remote from the erotic activities which are apparently applicant's principal interest.

As to these people, the board said:

We have no doubt that the overwhelming majority of the people who are potential readers of applicant's newsletter as described in the application (not as actually published by applicant) or potential users of social club services within the broad context of that description (not as actually conducted by applicant) would be affronted by the use as a mark of a photograph of a nude couple embracing, whether or not the models who posed for the photograph happened to be married to each other. This mark would be particularly offensive to those, among many others, who are parents of children of suggestible ages.

Secondly, the board indicated that, upon consideration of the photograph *per se*, when used as a mark, it would not be registrable. It said:

Indeed, it is our opinion that by any standard, including the most contemporary mores of what has been repeatedly described as a permissive, but not licentious, society, applicant's photograph, *when used as a mark for any goods or services*, is offensive to propriety and morality, outrages a sense of decency, and is shocking to the moral sense of members of the community, whose sensibilities are protected by the statute. Applicant's mark is immoral and scandalous, as those standards have been repeatedly interpreted and applied. [Emphasis supplied.]

Concluding its opinion, the board remarked:

We recognize that denial of registration will not affect applicant's continued use of his mark, but such use, both for the newsletter and the social club services, will be visible only to those who share applicant's interest and will be without the implied approval and the statutory benefits that would result from Federal registrations.

## POSITION OF THE PARTIES ON APPEAL

Appellant argues that section 2(a) is constitutionally "void for vagueness" because there is no satisfactory definition for the words immoral or scandalous, there have been no guidelines or standards established, and, as in obscenity cases, it is not possible to formulate a national standard. Appellant also argues that the mark in question is not, under any analysis, immoral or scandalous, comparing it to works of art such as Rodin's "The Kiss" and Michelangelo's "David." Appellant further argues that registration was improperly refused by the board due to its consideration of the specific information published and precise type of services rendered, and that the mark *per se* must be considered without regard to either the general or specific goods or services as a matter of law due to the failure of section 2(a) to include a reference to the goods and services. According to appellant, the fact

---

4. The board properly recognized that the broad descriptions in the applications are "controlling," although it observed that "erotic activi-
ties . . . are apparently applicant's principal interest."

that sections 2(d) and 2(e)[5] include a reference to goods or services, but section 2(a) does not, evinces the intent of Congress that, under section 2(a), marks be considered *per se* without regard to the underlying goods or services. Finally, appellant maintains that refusing registration will not limit the visibility of the mark and that granting registration does not imply approval by the United States Government.

The Solicitor argues that the mark may be refused registration under section 2(a) by considering the goods and services recited in the applications, or by considering "the goods and services with which it is actually used," or by analyzing the mark *per se* without regard to the goods or services in question. The Solicitor asserts that, under any analysis, the mark is immoral, *i. e.*, "patently offensive," and scandalous, *i. e.*, "shocking to the sense of propriety of the average person applying contemporary standards." The Solicitor suggests that an analogy be drawn to obscenity cases with the exception that a national standard be applied because "[i]t would be impractical to require the examining corps to be familiar with the community standards in each state or federal district." Finally, the Solicitor argues that the principal register "is not an art gallery" and that placing the mark on the register would be stamping the government's imprimatur on the picture which would be shocking to the average person.

## ANALYSIS

█ With respect to appellant's First Amendment rights, it is clear that the PTO's refusal to register appellant's mark does not affect his right to use it. *Holiday Inn v. Holiday Inn, Inc.*, 534 F.2d 312, 319 n.6, 189 USPQ 630, 635 n.6 (Cust. & Pat. App.1976). No conduct is proscribed, and no tangible form of expression is suppressed. Consequently, appellant's First Amendment rights would not be abridged by the refusal to register his mark.

█ There is, of course, a limited statutory right to registration, which carries certain benefits. Although, as appellant notes, these are more procedural than substantive, that right cannot be denied without compliance with Fifth Amendment due process requirements. This entails a determination of whether the term "scandalous"[6] is sufficiently precise to enable the PTO and the courts to apply the law fairly and to notify a would-be registrant that the mark he adopts will not be granted a federal registration. The Supreme Court "has consistently held that lack of precision is not itself offensive to the requirements of due process. '. . . [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices . . . .'" *Roth v. United States*, 354 U.S. 476, 491, 77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498 (1957). We note the similarity of the issue in this case to such issues as likelihood of confusion and descriptiveness for purposes of sections 2(d) and (e) of the Lanham Act, and that, al-

**5.** 15 U.S.C. § 1052(d) and (e) provide in pertinent part:

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

. . . .

(d) Consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, *when applied to the goods of the applicant*, to cause confusion, or to cause mistake, or to deceive . . . .

(e) Consists of a mark which, (1) *when applied to the goods of the applicant* is merely descriptive or deceptively misdescriptive of them, or (2) *when applied to the goods of the applicant* is primarily geographically descriptive or deceptively misdescriptive of them, except as indications of regional origin may be registrable under section 1054 of this title . . . . [Emphasis supplied.]

**6.** Because of our holding, *infra*, that appellant's mark is "scandalous," it is unnecessary to consider whether appellant's mark is "immoral." We note the dearth of reported trademark decisions in which the term "immoral" has been directly applied.

though "each case involving a trademark (or servicemark) stands on its own facts," *In re Quik-Print Copy Shops, Inc.*, 616 F.2d 523, 526 n.8, 205 USPQ 505, 507 n.8 (CCPA 1980), such terms are not considered "void for vagueness." Nor does the fact that decisions of the board and the courts on the issue of likelihood of confusion are often subjective detract from their validity. *See Warner-Hudnut, Inc. v. Wander Co.*, 280 F.2d 435, 47 CCPA 1172, 126 USPQ 411 (1960); Vandenburgh, *Trademark Law and Procedure* 141 (2d ed. 1968) and cases cited. Accordingly, we conclude that the term "scandalous" is sufficiently precise to satisfy due process requirements.[7]

■ In determining whether appellant's mark may be refused registration as scandalous, the mark must be considered in the context of the marketplace as applied to only the goods or services described in the application for registration. Whether or not the mark, including innuendo, is scandalous is to be ascertained from the standpoint of not necessarily a majority, but a substantial composite of the general public. *In re Riverbank Canning Co., supra*, 95 F.2d at 329, note 7, 25 CCPA at 1031, 37 USPQ at 270. If it is determined to be scandalous, registration must be refused.

7. This court, in the context of section 2(a), has stated that "[t]he field is almost limitless from which to select words [or pictorial displays] for use as trade-marks, and one who uses debatable marks does so at the peril that his mark may not be entitled to registration." *In re Riverbank Canning Co.*, 95 F.2d 327, 329, 25 CCPA 1028, 1032, 37 USPQ 268, 270 (1938).

8. We note that the board has taken the proper approach in the past. When determining that the mark "WEEK-END SEX" as applied to a magazine was not "so offensive to the public sense of propriety or morality as to preclude registration thereof," it refused to consider the specific content of the articles and pictures stating: "the question of whether or not the contents of the magazine may be pornographic in nature, is not an issue to be decided by this Board. If such were the criterion, many well-known magazines with inoffensive or arbitrary titles might well have been precluded registration in the Patent Office." *In re Madsen*, 180 USPQ 334, 335 (1973). *Cf. Tuxedo Monopoly, Inc. v. General Mills Fun Group*, 648 F.2d 1335,

■ Contrary to the Solicitor's argument, the Lanham Act does not require, under the rubric of "scandalous," any inquiry into the specific goods or services not shown in the application itself. Thus, the PTO's views with respect to the specific information disseminated by appellant in his newsletter and the specific services provided by appellant are not relevant.[8]

■ The Solicitor suggests an analogy to obscenity cases. We disagree.[9] Section 2(a) does not use the term "obscene," but uses the term "scandalous." Because there is a paucity of legislative history of this provision, we must look to the "ordinary and common meaning" of that term. *In re Riverbank Canning Co., supra*, 95 F.2d at 328, note 7, 25 CCPA at 1029, 37 USPQ at 269. This may be established by reference to court and board decisions and dictionary definitions.

In affirming the Commissioner's refusal to permit registration of "MADONNA" for wines, this court, by reference to dictionary definitions, defined a "scandalous" use of a mark as use which would be " 'shocking to the sense of . . . propriety,' " would "give 'offense to the conscience or moral feelings,' " or would "call out condemnation." *In re Riverbank Canning Co., supra*, 95 F.2d at 328, note 7, 25 CCPA at 1029–30, 37 USPQ at 269.[10] *Webster's New Interna-*

1337, 209 USPQ 986, 988 (1981), and cases cited; *Intercontinental Mfg. Co. v. Continental Motors Corp.*, 230 F.2d 621, 622, 43 CCPA 841, 843, 109 USPQ 105, 106 (1956).

9. It is well established in obscenity cases that nudity *alone* is not obscene. *See Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). However, the threshold for objectionable matter is lower for what can be described as "scandalous" than for "obscene," and appellant's mark involves more than mere nudity.

10. The prohibition against registration of a mark that consists of or comprises immoral or scandalous matter was originally enacted as section 5(a) of the Act of February 20, 1905 (Pub.L.No.84, 33 Stat. 724). This prohibition was reenacted as section 2(a) of the Act of July 5, 1946 (Pub.L.No.489, 60 Stat. 427), over eight years after this court's opinion in *In re Riverbank Canning Co.* Thus, there was ample time for the Congress to become aware of that opin-

*tional Dictionary* (2d ed. 1942), defines "scandalous" as "Giving offense to the conscience or moral feelings; exciting reprobation, calling out condemnation .... Disgraceful to reputation ...." *Funk & Wagnalls New Standard Dictionary* (1945) defines "scandalous" as "shocking to the sense of truth, decency, or propriety; disgraceful, offensive; disreputable, as *scandalous* conduct." [11]

The board has determined that "BUBBY TRAP" as applied to brassieres is vulgar, stating that it—

> would be offensive to a segment of the public sense of propriety or morality and is therefore prohibited by section 2(a) of the Act. 'Vulgar', as defined, means, inter alia, lacking in taste, indelicate, morally crude, and can, in our opinion, be encompassed by the term scandalous matter.

*In re Runsdorf*, 171 USPQ 443, 443–44 (1971). The Assistant Commissioner refused registration of "QUEEN MARY" for underwear on the basis that it would be " 'shocking to the sense of propriety'." *In re Martha Maid Manufacturing Co.*, 37 USPQ 156 (1938).

In providing that marks comprising scandalous matter not be registered, Congress expressed its will that such marks not be afforded the statutory benefits of registration. We do not see this as an attempt to legislate morality, but, rather, a judgment by the Congress that such marks not occupy the time, services, and use of funds of the federal government. [12]

Once a registration is granted, the responsibilities of the government with respect to a mark are not ended. The benefits of registration, in part with government assistance, include public notice of the mark in an official government publication and in official records which are distributed throughout the world, maintenance of permanent public records concerning the mark, availability of the Customs Service for blocking importation of infringing goods, access to federal courts where there is a presumption of validity of the registration (*e. g.*, that the mark is *not* immoral or scandalous), notices to the registrant concerning maintenance of the registration, and, to some extent, direct government protection of the mark in that the PTO searches its records and refuses registrations to others of conflicting marks. Apart from nominal fees, these costs are underwritten by public funds.

Unlike the situation in some obscenity cases, the graphic portrayal before us does not appear within the covers of a magazine or book to be freely examined or ignored by a person knowing the contents. Instead, as a mark, it may be used in a prominent location for public viewing by persons of all ages and convictions. As to appellant's argument that the mark is no more offensive than works of art which are publicly displayed, we agree with the board that "as

ion and to modify the law if it determined that the state of the law, as interpreted by that opinion, was not in accord with its intent. That Congress has continued for over seventy-six years the prohibition against registration of a mark that consists of or comprises immoral or scandalous matter indicates its satisfaction with administration of the law by the PTO and review by this court.

11. We note that the dictionary editions cited were extant at the time of enactment of the Lanham Act in 1946, and it is these definitions which, in the absence of evidence to the contrary, the Congress considered in framing the Act.

12. In *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), a majority of the Supreme Court agreed that while the Commission could not prevent the broadcast of "indecent" words by a licensee, the Commission might use the incident to refuse to renew a license of the broadcaster. This case presents none of the difficulties which were viewed by some of the justices in *Pacifica* as creating Constitutional problems in that the public was being denied access to certain material. As pointed out above, there is no prohibition against appellant's use of his mark or any limitation on enforcement of his rights under the common law or state legislation. What is denied are the benefits provided by the Lanham Act which enhance the value of a mark. For a concise history of the extension of federal registration to various types of marks see J. McCarthy, *Trademarks and Unfair Competition*, 115–20 (1973).

trademarks or service marks, they are not before us for adjudication."

In view of the foregoing, we hold that appellant's mark is "scandalous."[13] Accordingly, the board's decision must be affirmed.

*AFFIRMED.*

RICH, Judge, with whom BALDWIN, J., joins, dissenting.

I find the majority opinion lacking in factual foundation on the main issue of whether the picture sought to be registered as a trademark is "scandalous" when used on the goods and services named in the application.

I agree that the goods and services, as recited, must be considered together with the mark, as was done in *In re Riverbank Canning Co.*, 95 F.2d 327, 25 CCPA 1028, 37 USPQ 268 (1938). The majority is also correct in stating that "the Lanham Act does not require, under the rubric of 'scandalous,' any inquiry into the specific goods or services not shown in the application." The statement is, however, somewhat ambiguous in the words "shown in the application" because the application contains copies of the "Newsletter" as specimens. I take it that the majority is intending to say that the Lanham Act does not require us to look at the contents of the newsletter and that we should restrict ourselves to considering the picture sought to be registered and the *fact* that it is used as a trademark on *a newsletter*, not taking the contents into consideration.

Following this correct procedure, the issue is whether this picture on any "Newsletter Devoted to Social and Interpersonal Relationship Topics" or "Social Club Services," regardless of what those services are, is "scandalous" under 15 U.S.C. § 1052(a). The *contents* of the newsletter and the *nature* of the actual services rendered by appellant being left out of consideration, decision rests on the nature of the picture.

Like the majority and the members of the board, I have seen every version of the picture contained in the certified record and briefs and I do not find use of this picture on the goods or services named in the application to present a "scandalous" mark. I agree that the heterosexual couple are nude, that they are kissing, that they are embracing in that sense (the man has his arm around the woman's neck and the woman is holding the man's head in her hand), but, amazingly, on the crucial matter the majority equivocates in the phrase "appearing to expose the male genitalia." Either it does or it doesn't and I find it doesn't. Therefore, I find the record does not support a fact I believe the majority thinks is controlling but I speculate since I do not really know why the majority holds the mark to be scandalous.

The majority appears to rely on the *Riverbank* (MADONNA for wine) case decided in 1938. It was a three-to-two decision and I feel the dissenters took the sounder position. I think the decision is no longer of precedential value in view of the social changes in the ensuing 43 years. The majority cites *Riverbank* in apparent support of using as a basis for decision the imagined feelings of "a substantial composite of the general public." There is no such expression in *Riverbank* and I am at a loss to know what it means or how one can have a "composite" of a class such as "the general public."

I would reverse. More "public funds" are being expended in the prosecution of this appeal than would ever result from the registration of the mark.

---

13. The issue is not whether the act of registration would create a scandal insofar as the relationship between the PTO and the public is concerned, but whether the mark comprises scandalous matter based on the ordinary and common meaning of "scandalous." Whether the PTO would be considered to have placed its imprimatur on the mark (the subject of opposing arguments) is not relevant.