THIS OPINION IS A
PRECEDENT OF THE T.T.A.B.

Mailed:  November 26, 2008

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

In re Heeb Media, LLC

_____

Serial No. 78558043

_____

Jerald Tenenbaum of Fridman Law Group, PLLC for Heeb Media, LLC.

Allison Schrody, Trademark Examining Attorney, Law Office 115 (J. Brett Golden, Managing Attorney).

_____

Before Seeherman, Holtzman and Kuhlke, Administrative Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Heeb Media, LLC, applicant, has filed an application to register the mark HEEB (in standard character form) for "clothing, namely, jackets, jerseys, sweat pants, sweat shirts, track suits, t-shirts, tank tops and pants; headwear" in International Class 25 and "entertainment, namely, conducting parties" in International Class 41.[1]  The application includes a claim of ownership of Registration

_____

[1] Application Serial No. 78558043, filed February 1, 2005, alleging February 1, 2002 as the date of first use and first use in commerce in both classes under Section 1(a) of the Trademark Act.

No. 2858011 issued on June 29, 2004 for the mark HEEB (in standard character form) for "publication of magazines" in International Class 41.

Registration has been finally refused under Section 2(a) of the Trademark Act, 15 U.S.C. §1052(a), on the ground that applicant's mark "is disparaging to a substantial composite of the referenced group, namely, Jewish people."

When the refusal was made final, applicant appealed and the appeal has been fully briefed.  We affirm the refusal.

As a preliminary matter, we note that the evidence attached to applicant's brief, which was not introduced into the record during the prosecution of the application, is untimely.  Trademark Rule 2.142(d).  However, although the examining attorney pointed out its untimeliness, she specifically considered it and relied on it; therefore, we treat it as being of record.

We further note that much of the discussion in the briefs, as well as the evidence that has been submitted, relates to applicant's magazine which has the title HEEB. While it is useful to understand the context in which the mark is used, we ultimately must determine how the term HEEB will be perceived in connection with the goods and

services listed in this application, which do not include magazines.

The examining attorney contends that the word HEEB is a highly disparaging reference to Jewish people, that it retains this meaning when used in connection with applicant's goods and services, and that a substantial composite of the referenced group finds it to be disparaging. In support of this contention the examining attorney has submitted several dictionary definitions that define HEEB as a derogatory word, including the following definition from The Cassell Dictionary of Slang (1998): "Hebe/Heeb -- a derog. term for a Jew."[2] We also take judicial notice of the following definition from The New

---

[2] Other definitions from reference works and websites include:

"Heeb -- a Jewish person. (Usually intended and always perceived as derogatory)," Forbidden American English (1990);

"Hebe/Heeb -- a Jew. Based on the word Hebrew, these words originated in the USA. They have been heard in Britain and Australia since the early 1970s, sometimes jocularly lengthened to heebie-jeebies. Hebe is less offensive than yid, kike, etc., but discriminatory nonetheless," xreferplus.com (retrieved March 13, 2006);

"Heeb 1) a racial slur against Jews derived from a contraction of Hebrew, and 2) a racial slur against either people of Jewish descent or people practicing the religion of Judaism," urbandictionary.com (retrieved February 22, 2007);

"Heeb – Jews," Racial Slur Database at johncglass.com (retrieved February 22, 2007); and

"Hebe – An offensive, derogatory slang term for a Jewish person," everthing2.com (February 27, 2001 entry).

Oxford American Dictionary (2d ed. 2005): "Hebe n.

*informal, offensive* a Jewish person. > early 20th cent.:

abbreviation of Hebrew."[3]  In addition, the examining

attorney submitted printouts of excerpts retrieved from the

Nexis database which report that individuals representing

Jewish groups or in their individual capacity consider the

term HEEB to be a disparaging term, including as used in

connection with applicant's magazine.  Some examples

highlighted by the examining attorney are reproduced below:

> Adopting a "title for a publication that is
> offensive to many Jews is unnecessary and in my
> view counterproductive," said Ken Jacobson,
> ADL's [Anti-Defamation League] associate national
> director.  "One could argue this is a sign that
> Jews have really made it, that people can poke
> fun and really satirize."  However, "we're also
> living in a world where anti-Semitism is
> flourishing," he said.  "The usual sensitivity
> should continue and not assume that things are so
> secure."  "Jewish Telegraphic Agency," December
> 18, 2003;

> "Heeb is an effort to get some attention with a
> tasteless title," says Sanford Pinsker, a
> professor specializing in Jewish-American
> literature and comedy at Franklin & Marshall
> College.  "It would have to be explained to me
> that the person who called me a Heeb was not
> meaning to be offensive."  "Christian Science
> Monitor," February 14, 2002;

> "I think it is a bad idea for a name.  Certainly,
> I could think back to Archie Bunker, who quite

---

[3] The Board may take judicial notice of dictionary definitions. University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., 213 USPQ 594, 596 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

> frequently would refer to Jews as heebs and other
> derogatory names.  Just knowing that it is a
> derogatory name and it has a derogatory history,
> you have to start thinking, well, if it was a
> black magazine trumpeting African-American
> history or events or culture, would it be named
> the N-word?  Or [if] it was Hispanic, would an
> editor come along and name it a word that starts
> with S?  I can't see it happening.  And I don't
> understand why there are Jewish groups and
> charities and whatever that help fund this
> magazine.  I think it is a terrible choice for a
> name."  WABC talk-show host, Steve Maltzberg
> quoted on CNN Talkback Live, February 6, 2002;
> and
>
> What about the show's use of the derogatory word
> "heeb?"  Apparently, it's become hip (there's
> that word again) among some Jews to refer to
> themselves as heebs, a word traditionally on par
> with "nigger."  "New York Post," December 18,
> 2005 (in reference to the television program "So
> Jewtastic").

In traversing the refusal, applicant contends that the examining attorney failed "to properly apply the test for determining whether a mark consists of or comprises matter which is disparaging or which may bring individuals of the Jewish faith into contempt or disrepute" and to "properly consider the evidence submitted by Applicant in response to the Office Action dated April 15, 2006."  Br. p. 4. Specifically, applicant argues that the examining attorney "ignored the context and manner in which applicant's mark is used when determining whether the likely meaning of applicant's mark is disparaging to the Jewish community." Br. p. 5.

Applicant also argues that the examining attorney's evidence is insufficient to meet the USPTO's burden to set forth a prima facie case. In particular, applicant contends that the determination of disparagement cannot be based "on isolated editorial comments made by members of one organization or one vocal individual whose opinions do not represent Jewish popular thought or the cultural mainstream." Br. pp. 6-7.

Applicant states that "many of this country's most established Jewish philanthropies and cultural organizations have openly and actively supported Applicant's magazine and events through their continued funding and sponsorship." October 13, 2006, Response p. 2. In support of this statement, applicant made of record evidence that includes letters from various individuals representing prominent Jewish organizations, such as the UJA Federation and Hillel, or that were submitted in their individual capacity.[4] A few excerpted examples are set forth below:

> There can be no doubt that the word "Heeb" (also spelled "Hebe") has historically been used as "a derogatory term for a Jew," and that is precisely how the Oxford English Dictionary defines the word. I myself can recall hearing this taunt as

---

[4] It appears from the content of the letters that the authors were giving their views about the use of HEEB for a magazine, rather than for the goods and services at issue herein.

6

a youngster in public school, and even today, the term is occasionally used in this way by prejudiced people.  The individuals who founded Heeb Magazine, however, are themselves Jewish, and their magazine received significant start-up money from the Joshua Venture, a fund dedicated to stimulating Jewish "social entrepreneurship" and supported by such notable Jewish leaders as Charles Bronfman and Steven Spielberg.  The editor and most of the thousands of readers of Heeb are likewise Jewish.  Given this context it is clear that Heeb aims to transvalue the term "heeb" from an epithet into a term of Jewish empowerment... I know that the young people behind Heeb have intentions that are anything but "scandalous and immoral."  To the contrary, these young men and women are engaged in myriad efforts to revitalize American Jewish life.  Heeb is part of their effort to re-engage those who have grown disaffected with their heritage.  Letter from Jonathan D. Sarna, Professor of American Jewish History at Brandeis University;

Heeb is widely distributed among the Jewish student population with whom we work so closely, and currently we have yet to receive any complaints about the name or its availability on our over one hundred college campuses.  Not only have we not received any complaints among the student population but we have yet to receive a single complaint from a parent or a community member.  While there may be some in the Jewish and non-Jewish community who take offense to the magazine's articles, it has been our uniform impression that the Jewish audiences Hillel interacts with understand the playful, satirical nature and format of the magazine, and do not consider the name to be offensive...The magazine's target population of Jewish students and young Jewish adults certainly were not around to experience the negative associations with the word 'hebe' as some of the older Jewish generations may have.  Letter from Wayne L. Firestone, President, Hillel, The Foundation for Jewish Campus Life; and

In the case of this magazine and other examples I will cite, the meaning of the word and feelings attached to it has a generational character, with younger and more confident Jews embracing a term of abuse as a badge of honor (note the magazine's subtitle: "The New Jew Review"), while the word generally makes an older generation uncomfortable.... While there will be those in the Jewish community who find the magazine, both its name and its content, offensive, there are many others who embrace its unflinching and confrontational style in giving voice to a new generation of proudly Jewish youth in search of unconventional ways of defining themselves. Barbara Kirshenblatt-Gimblett, Professor of Performance Studies, New York University.

In further support of its position, applicant also submitted examples of advertisements in its magazine which show, according to applicant, the acceptance of the term by a wide range of Jewish organizations (e.g., American Jewish World Service, Birthright Israel, Jewish Fund for Justice, Museum of Jewish Heritage, New Israel Fund, University of Judaism) and various commercial enterprises (e.g., American Apparel, Sony BMG Music, SoyVay, Stella Artois, Streits).

In addition, applicant states that it receives "institutional support" from Steven Spielberg's Righteous Persons Foundation, the Nathan Cummings Foundation, the Walter and Elise Haas Foundation, the United Jewish Appeal, Hillel, The National Foundation for Jewish Culture and the Charles & Lynn Schusterman Family Foundation. The record also shows that applicant's magazine currently has

approximately 100,000 subscribers.  Finally, applicant points to a later revision of a dictionary entry submitted by the examining attorney that applicant contends supports non-disparaging uses of the term.  The 1998 edition of The Cassell Dictionary of Slang defines Heeb as "a derog. term for a Jew" (see supra), whereas the 2005 second edition includes the following additional entry, "[1920's+] Jewish."

Registration of a mark which consists of matter which may disparage, inter alia, persons is prohibited under Section 2(a) of the Trademark Act.  To determine whether a proposed mark is disparaging the Board applies the following two-part test ("Harjo test"):

> 1)  what is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services; and
>
> 2)  if that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

In re Squaw Valley Development Co., 80 USPQ2d 1264, 1267 (TTAB 2006).  See also Harjo v. Pro-Football, Inc., 50 USPQ2d 1705, 1740-41 (TTAB 1999), rev'd on other grounds, 284 F. Supp.2d 96, 68 USPQ2d 1225 (D.D.C. 2003), remanded,

415 F.3d 44, 75 USPQ2d 1525 (D.C. Cir. 2005), on remand, 567 F. Supp.2d 46, 87 USPQ2d 1891 (D.D.C. 2008).

The burden of proving that a mark is disparaging rests with the USPTO. Squaw Valley, 80 USPQ2d at 1271. See also In re Boulevard Entertainment, Inc., 334 F.3d 1336, 1339, 67 USPQ2d 1475, 1477 (Fed. Cir. 2003), citing In re Mavety Group, Ltd., 33 F.3d 1367, 31 USPQ2d 1923 (Fed. Cir. 1994).

Whether a proposed mark is disparaging must be determined from the standpoint of a substantial composite of the referenced group (although not necessarily a majority) in the context of contemporary attitudes. Squaw Valley, 80 USPQ2d at 1269 and Harjo, 50 USPQ2d at 1758. See also Boulevard, 67 USPQ2d at 1477 and In re McGinley, 660 F.2d 481, 211 USPQ 668, 673 (CCPA 1981). It has been held that, at least as to offensive matter, dictionary evidence alone can be sufficient to satisfy the USPTO's burden, where the mark has only one pertinent meaning. Boulevard, 67 USPQ2d at 1478.

Finally, as noted above, while applicant's use of the mark for a magazine may assist in understanding how the term will be perceived by the relevant group, we make our determination based on the goods and services as identified in the application, which do not include either magazines or the service of publishing magazines.

10

Under the Harjo test we must first determine, based on the evidence of record, the "likely meaning" of HEEB, taking into account the nature of the goods and services and the manner in which it is used in the marketplace. The second prong addresses whether that meaning is disparaging to a substantial composite of the relevant group.

As to the first prong, we look at the "likely meaning" in the context of the goods and services as identified. Here, there is no dispute that HEEB means a Jewish person and that HEEB has no other meaning pertinent to clothing or entertainment services. There are no "other elements" in the mark to affect its meaning, and there is nothing about the way the mark is used in the marketplace from which one would understand the term as meaning anything other than a Jewish person, even if a person connected the clothing or entertainment services with applicant's magazine which is published by, targeted towards, and about Jewish people. See, e.g., Harjo, 50 USPQ2d at 1742, rev'd on other grounds 68 USPQ2d 1225 ("This is not a case where, through usage, the word 'redskin(s)' has lost its meaning, in the field of professional football, as a reference to Native Americans in favor of an entirely independent meaning as the name of a professional football team. Rather, when considered in relation to the other matter comprising at least two of the

11

subject marks and as used in connection with respondent's services, 'Redskins' clearly both refers to respondent's professional football team and carries the allusion to Native Americans inherent in the original definition of that word.")

Turning to the next prong, we must determine whether or not the term would be perceived as disparaging. Applicant argues that "the context in which Applicant uses the term 'heeb' is the exact opposite of derogatory and is rather as a symbol of pride and progressive identity among today's Jews." Br. p. 5. Applicant argues, in particular, that the entertainment services are "nearly always tailored to Jewish themes and are always held in support of Jewish community building...[and] are attended almost exclusively by members of the Jewish community, making the broad acceptance of the term 'heeb' unmistakable in this context." Br. p. 6.

However, as noted above, the identification of the goods and services in this application, i.e., clothing and entertainment services, is not limited to use by a Jewish group for those in the Jewish community who are not offended by this use.[5] In other words, the use is presumed

---

[5] In this regard we note that, inasmuch as the identification of goods and services is not limited to clothing and entertainment

to be public use viewable by any member of the referenced group, including those members of the group who may be offended by the term. Our consideration of whether the term is disparaging is not restricted to the perception of applicant's magazine subscribers who have no objection to HEEB as the title of applicant's magazine. Rather, we are charged with taking into account the views of the entire referenced group who may encounter applicant's clothing and advertising for its entertainment services in any ordinary course of trade for the identified goods and services. Thus, all members of the American Jewish public may encounter the HEEB mark in advertising in newspapers, billboards, or magazines (other than applicant's magazine), on a website or, with respect to the clothing items, in stores selling the clothing (the identification has no limitations as to channels of trade), and, in the context of the clothing where HEEB would be emblazoned on the apparel (such as t-shirts and sweatshirts), all public places where that clothing is worn. Boston Red Sox Baseball Club Limited Partnership v. Brad Francis Sherman, ___ USPQ2d ___ (Slip Op. 91172268, September 9, 2008).

---

services offered by Jews and for Jews, once registered, this registration could be assigned to anyone, and these goods and services could be offered in all channels of trade to all classes of consumers.

The dictionary definitions unanimously underscore the derogatory nature of HEEB.  Even the 2005 edition of the Cassell Dictionary of Slang relied upon by applicant in view of the following definition "adj. [1920's+] Jewish," continues to include the entry that clearly indicates the derogatory character of the term HEEB, "a derog. term for a Jew."  Thus, we cannot conclude from this dictionary entry that, in referencing Jewish persons, the term has a separate non-derogatory character today.

Applicant argues that the Jewish community does not object to, or does not view, applicant's use of HEEB as a trademark to be disparaging.  Applicant cites to its evidence of letters from "prominent members of the Jewish community endorsing applicant."  However, this evidence is countered by the examining attorney's substantial evidence of others in the Jewish community who have objected to use of the term in the context of applicant's magazine.  Even Jennifer Bleyer, one of the founders of applicant's magazine, has acknowledged that the term is perceived as disparaging by some members of the Jewish community: "There are actually some people, who are fairly prominent in the Jewish community, who have written me some nasty e-mails, who definitely said that they're offended by the name."  "New York Observer," July 30, 2001.

Moreover, applicant's own evidence shows that not all members of the relevant public find the term HEEB to be unobjectionable. On the contrary, the letters submitted by applicant recognize that some members of the relevant public find the term derogatory, and suggest that there is a generational divide in the perception of this term. For example, Professor Sarna writes that he "can recall hearing this taunt as a youngster in public school, and even today, the term is occasionally used in this way by prejudiced people." Mr. Firestone, president of the Jewish student organization Hillel, explains that "the magazine's target population of Jewish students and young Jewish adults certainly were not around to experience the negative associations with the word 'hebe' as some of the older Jewish generations may have." Professor Kirshenblatt-Gimblett writes that "While there will be those in the Jewish community who find the magazine, both its name and its content, offensive, there are many others who embrace its unflinching and confrontational style in giving voice to a new generation of proudly Jewish youth in search of unconventional ways of defining themselves."

What is clear from the record is that within the referenced group there are disparate views, perhaps most prominently delineated along generational lines, as to

whether HEEB retains its disparaging character in the context of applicant's use in connection with its magazine. We find it reasonable to conclude that such disparate views likewise exist in connection with use of the mark for applicant's clothing and entertainment services. Thus, the question raised by this record is how do we balance competing views within the referenced group.

Applicant argues that the examining attorney's:

treatment of the Harjo test fails to satisfy the demands of the statute [by failing] to define what actually constitutes a "substantial composite," the resulting offer of a veto to a small minority over a term that is a source of pride to many young, progressive Jews, the failure to take account of how the Harjo rule should work where some people may consider a term negatively, but many others find it a source of pride, all mean that the Examining Attorney has failed to satisfy her burden in this case. According to her, however, except for the views of a vocal minority (while the Examining Attorney insists on characterizing one group as "small" and the other as "substantial," she offers no evidence of the relative size of these two groups), the fact that a term is a source of pride for many members of the group is simply "irrelevant."... Applicant would urge that the rule be sufficiently elaborated to take account of a situation where, as here, a term considered negatively by a small group of a larger community is a source of pride to another, perhaps even larger group. It simply defies logic, and the spirit of the Lanham Act, that a small group of determined naysayers can veto the use of a source of pride to what even the examiner characterizes as a young and progressive social movement, further endorsed and supported by Jewish foundations and organizations, as well as the business community. In fact, the examining

16

> attorney admits that the rule, as she construes it, makes the vocal naysayers the only "focal point" that matters in this case.

Reply Br. pp. 4-5.

Contrary to applicant's position, we find that the examining attorney has met her burden and applicant has not satisfactorily rebutted the prima facie case of disparagement. In evaluating the examining attorney's evidence we must be cognizant of the USPTO's limitations in amassing evidence and "we look only for substantial evidence, or more than a scintilla of evidence, in support of the PTO's prima facie case." In re Pacer Technology, 338 F.3d 1348, 67 USPQ2d 1629, 1632 (Fed. Cir. 2003). See also, Squaw Valley, 80 USPQ2d at 1272. Further, in the absence of direct evidence, the Office may meet its burden by extrapolating from the evidence of record that a substantial composite of Jewish Americans find applicant's use of HEEB for the identified goods and services to be disparaging. Squaw Valley, 80 USPQ2d at 1272. As noted above, all of the dictionary and online references characterize HEEB as a derogatory term. In addition, the record in this case contains evidence of members of the referenced group objecting to use of the term HEEB even in

17

the context of applicant's use on magazines.[6]  From this we may extrapolate that they would find it disparaging when displayed across the front of a t-shirt or used to promote applicant's entertainment services.

The fact that applicant has good intentions with its use of the term does not obviate the fact that a substantial composite of the referenced group find the term objectionable.  Applicant's evidence, in support of its contention that its use of the term HEEB is not disparaging, does not erase the perception of the others, as represented by the examining attorney's evidence.  From this we conclude that applicant's intentions do not change the analysis.  This record clearly establishes that applicant's intent does not remove the "anti-Semitic animus" when applicant uses the word HEEB.  Our focus must be on the perception of the referenced group and not applicant's intentions.

With regard to applicant's argument that a minority opinion should not veto registration of a particular mark, this is not in keeping with the standard set forth by our primary reviewing court.  While case law does not provide a

---

[6] We note that although we are analyzing the evidence of use of the term HEEB as the title of a magazine, this cannot be viewed as an attack on applicant's prior registration inasmuch as that registration is not for a magazine, but for publishing services.

fixed number or percentage, it is well established that a "substantial composite" is not necessarily a majority. In re McGinley, 211 USPQ at 673. Here we have clear evidence that a substantial composite of the referenced group considers HEEB to be a disparaging term. The examining attorney has presented evidence from various segments of the Jewish community, including the Anti-Defamation League, a university professor, rabbis, a talk-show host and ordinary citizens. Although perhaps among many of the college-age population to whom applicant's magazine is directed the word HEEB may not have the same derogatory connotation, the evidence is clear that, at a minimum, among the older generation of Jews the term retains its negative meaning. The post-college age Jewish population must be considered a substantial composite for purposes of our analysis. As noted above, applicant's identified goods and services must be deemed to be encountered by all members of the referenced group.

Overall, we find that the evidence of record supports a conclusion that the term is considered to be disparaging by a substantial composite of the referenced group, regardless of context, including in connection with applicant's identified goods and services. Squaw Valley, at 1277.

19

While applicant may intend to transform this word, the best that can be said is that it is still in transition. Although some in the community may not find it disparaging, as noted above, the evidence shows that there is a substantial component of those in the named group who do.

With regard to applicant's argument based on the First Amendment's proscription against restrictions on expression, this decision only pertains to applicant's right to register the term and "it is clear that the PTO's refusal to register [applicant's] mark does not affect [its] right to use it. No conduct is proscribed, and no tangible form of expression is suppressed. Consequently, [applicant's] First Amendment rights would not be abridged by the refusal to register [its] mark." In re McGinley, 211 USPQ at 672, citing Holiday Inn v. Holiday Inn, Inc., 534 F.2d 312, 189 USPQ 630, 635 n.6 (CCPA 1976). See also Mavety, 31 USPQ2d at 1928.

Applicant's argument that other potentially disparaging terms have been registered cannot assist it in registering a derogatory term. It is well established that even if some prior registrations have some characteristics similar to the applicant's, the USPTO's allowance of such prior registrations does not bind the Board. In re Nett Designs Inc., 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed.

Cir. 2001). "The fact that, whether because of administrative error or otherwise, some marks have been registered even though they may be in violation of the governing statutory standard does not mean that the agency must forgo applying that standard in all other cases." In re Boulevard, at 1480.

Finally, while applicant argues that doubt should be resolved in its favor, based on this record, we have no doubt that HEEB is disparaging to Jewish people.

**Decision**: The refusal to register under Section 2(a) is affirmed.