THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
September 19, 2011

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————————

**Trademark Trial and Appeal Board**

————————

In re Luxuria, s.r.o.

————————

Serial No. 79055664

————————

David L. May of Nixon Peabody LLP for Luxuria, s.r.o.

Charisma Hampton, Trademark Examining Attorney, Law Office 112 (Angela Wilson, Managing Attorney).

————————

Before Seeherman, Lykos and Shaw, Administrative Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Luxuria, s.r.o. has applied to register the design shown below, consisting of a bottle in the shape of a hand with middle finger extended upwards, hereafter referred to as the "Middle Finger design."[1]

---

[1] Application Serial No. 79055664, filed March 12, 2008, pursuant to Section 66A of the Trademark Act, based on International Registration No. 0969241.



The description of the mark is as follows:

The mark consists of product packaging, namely, a bottle in the shape of a hand with middle finger extended upwards. All other elements in the drawing including the background behind the product packaging and upon which the product packaging sits is not a claimed feature of the mark.

The color white is claimed as a feature of the mark.

The goods, as amended, are:

beers; mineral and aerated waters and other non-alcoholic drinks, namely, non-alcoholic cocktails, non-alcoholized wines, non-alcoholic punch, whey beverages, lemonade, vegetable juice, tomato juice, non-alcoholic fruit extracts used in the preparation of beverages, soy-based beverages not being milk substitutes, non-alcoholic malt beverages, isotonic beverages, energy beverages, milk of almond, ginger ale; fruit drinks and fruit juices; syrups, concentrates, or powders used for making beverages, in Class 32, and

alcoholic beverages except beers, in Class 33.

The trademark examining attorney has refused registration pursuant to Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), on the ground that the applied-for mark is immoral or scandalous.

Applicant has appealed this refusal.

After applicant and the examining attorney filed their respective briefs, applicant filed a request for remand in order to have the examining attorney consider additional evidence. The Board, in an order dated March 8, 2011, advised applicant that a request for remand must include a showing of good cause, and that in determining whether good cause has been shown, the Board will consider both the reason given and the point in the appeal at which the request for remand is made, and that the later in the appeal proceeding that the request for remand is filed, the stronger the reason that must be given for good cause to be found. TBMP § 1207.02 (3d ed. 2011). That order also pointed out that applicant had not stated that the additional evidence which it sought to have considered was not previously available, only that it had just recently come to its attention. The Board noted that some of the material had dates of, for example, 2003 and 2008, prior to applicant's filing its notice of appeal on November 30,

2009, although it was not clear when other material was published.  Because it was not clear from the face of the documents that this material was not previously available, the Board stated that applicant had not shown good cause for remanding the application and that applicant should have submitted an affidavit stating when the materials became available, or at least a date prior to which they were not available.  The Board allowed applicant 20 days in which to either file its reply brief or to submit a second request for remand that was supported by a showing of good cause, as indicated in the order.

Applicant thereupon filed a second request for remand. It stated only that "there are an indefinite number of resources where evidence is available, and parties can search for evidence with great diligence before actually being able to locate a particular piece of evidence.  Such is the case here, where this evidence has only just come to Applicant's attention after repeated searches."  Applicant did not give any details about the steps it took to search for this evidence during the prosecution of the application.  Nor did it submit an affidavit as suggested in the March 8, 2011 order regarding its efforts during

4

prosecution to obtain the additional evidence.[2]  Applicant also contended that its request for remand was made early in the proceedings.

In its March 30, 2011 order denying this second request for remand, the Board explained that the appeal was at a very late stage in the proceeding, since applicant's and the examining attorney's briefs had already been filed, and that if the request for remand were granted, prosecution would be reopened after which there would be supplemental briefs filed by both applicant and the examining attorney, thereby effectively starting the appeal process again.  Therefore, in view of applicant's failure to provide any details as to what efforts it had made during the prosecution of its application that would explain why the additional evidence could not have been previously obtained and made of record, the Board found that applicant had failed to show the requisite good cause.

Applicant thereupon filed its reply brief.  Attached to the reply brief is the same evidence that applicant had sought to make of record through its two requests for remand, both of which had been denied by the Board.  We are

---

[2]  We do not suggest by this that an affidavit is normally required to show good cause for a remand; it was suggested in this case because of the inconsistency between applicant's statement that the evidence had recently come to its counsel's attention, and the dates appearing on many of the materials.

at a loss to understand why applicant would submit material in this manner, when the Board had previously denied its requests for remand.  Needless to say, this material is not of record and will be given no consideration.  See Trademark Rule 2.142(d), 37 C.F.R. 2.142(d) (the record in the application should be complete prior to the filing of an appeal).  Moreover, because even a cursory review of the reply brief indicates that the brief discusses this material at length, applicant's reply brief has not been considered.  Applicant's attempt to avoid the consequences of the Board's prior orders by simply attaching material to its reply brief will not be tolerated.[3]

We now turn to the substantive issue in this appeal, whether applicant's Middle Finger design is immoral or scandalous.  Section 2(a) of the Trademark Act prohibits the registration of a mark which "consists of or comprises immoral … or scandalous matter."  "A showing that a mark is vulgar is sufficient to establish that it 'consists of or comprises immoral … or scandalous matter' within the meaning of section 1052(a)."  In re Boulevard Entertainment, Inc., 334 F.3d 1336, 67 USPQ2d 1475, 1477 (Fed. Cir. 2003).  The United States Patent and Trademark

---

[3]  We cannot help but note the convergence between applicant's actions toward the Board and the message conveyed by its mark.

6

Office, to meet its burden of showing that a mark is immoral or scandalous, "must consider the mark in the context of the marketplace as applied to the goods described in the application for registration." Id. Whether the mark consists of or comprises scandalous matter must be determined from the standpoint of a substantial composite of the general public (although not necessarily a majority), and in the context of contemporary attitudes. Id.

There is no question that applicant's design mark is a depiction of a human hand with the middle finger extended upwards. Applicant acknowledges that this representation is commonly referred to as "giving the finger" or "giving the bird." Applicant's brief, p. 3. The examining attorney has made of record several dictionary/reference material listings which refer to this gesture, including the following:

> "the finger" 1. (idiomatic) An obscene gesture, typically consisting of extending the middle finger at somebody;
> Wikitionary, http://en.wikitionary.org;
>
> Finger (gesture) In Western cultures, the finger (as in giving someone the finger) is a well-known obscene hand gesture made by extending the middle finger of the hand while bending the other fingers into the palm.
> Wikipedia, http://en.wikipedia.org;
>
> Bird 10. the bird, *Slang.*

7

c.  an obscene gesture of contempt made by
raising the middle finger.
Dictionary.com, http://dictionary.reference.com;
and

Bird  8.  An obscene gesture of anger, defiance,
or derision made by pointing or jabbing the
middle finger upward.
The Free Dictionary, www.thefreedictionary.com

In addition, the examining attorney submitted articles

about the middle finger gesture, excerpts from some of

which are set forth below:

Why is The Middle Finger Offensive? [title]
The middle finger is one of our species' oldest
and most ubiquitous insulting gestures.
[article includes a photo of a car with an arm
stuck out of the window, presumably "giving the
finger," although that portion of the hand has
been deliberately blurred]
February 2, 2009, www.mentalfloss.com

FCC reviewing NBC's Golden Globes telecast
[title]
After receiving multiple complaints about NBC's
Sunday telecast of the Golden Globes, the FCC
said Wednesday that it is reviewing the program
for possible violations of indecency rules.
Toward the end of the program, director Darren
Aronofsky was caught on camera jokingly making an
obscene gesture--"flipping the bird," as it's
commonly called--at actor Mickey Rourke, who was
onstage accepting an acting award for Aronofsky's
film "The Wrestler."
January 14, 2009, "Los Angeles Times,"
http://latimesblogs.latimes.com

PBS plays it safe with language in Iraq
documentary (title)
…
Seven profanities were bleeped out of the
documentary and several graphic images were
blurred, including that of a soldier raising his
middle finger at a picture of Saddam Hussein.

8

…
The film is scheduled to run at 10 p.m. in much of the country, within the "safe harbor" time period when broadcasters are allowed to air what the FCC might consider to be indecent or profane material because children are less likely to be watching.
Still, PBS officials decided to edit out the coarse language and images because the program is set to run an hour earlier in the central time zone.
April 13, 2007, Daily Camera, www.dailycamera.com.

The Finger
A (Short) History of the Longest Finger [title]
Giving someone "the finger" is one of the basest violations in modern culture….
www.ooze.com

Finally, we take judicial notice of definitions taken from mainstream dictionaries.[4] The American Heritage Dictionary of the English Language, 4th ed. (2006), lists the following definitions, which are the same as the definition in The Free Dictionary:

Finger: 6. an obscene gesture of defiance or derision made by pointing or jabbing the middle finger upward Often used with *the*.

Bird: 8. An obscene gesture of anger, defiance, or derision made by pointing or jabbing the middle finger upward.

The Random House Unabridged Dictionary, 2d ed. (1987), provides the following definition of "the bird," found in

---

[4] The Board may take judicial notice of dictionary definitions. University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc., 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

the definitions of "bird": *Slang.* c. an obscene gesture of contempt made by raising the middle finger.

The foregoing evidence demonstrates that the gesture depicted in applicant's mark is vulgar; in fact, the definitions quoted above characterize the gesture as "obscene." See In re McGinley, 660 F.2d 481, 211 USPQ 668, 673 n.9 (CCPA 1981) ("[T]he threshold for objectionable matter is lower for what can be described as 'scandalous' than for 'obscene'…"). Dictionary definitions alone, if a term has no other meaning, are sufficient to satisfy the Office's burden of showing that the mark is scandalous to a substantial composite of the general public. In re Boulevard Entertainment, 67 USPQ2d at 1480. Here, however, we have more than just dictionary definitions; the definitions and articles establish that applicant's mark is scandalous to a substantial composite of the general public.

Further, the goods identified in the application are general consumer products, purchased by the public at large. Applicant has stated that its goods "are planned to be placed in shops, supermarkets, and similar venues where consumers will purchase the goods for consumption." Response filed August 5, 2010. Because the channels of trade for the goods include supermarkets, where goods are

normally displayed on retail shelves, applicant's trademark will be visible to all consumers shopping in such places, including parents shopping with their children.[5]  Therefore, even if some individuals might personally find bottles "giving the finger" funny, many, if not all, of these individuals would not find it funny to expose their children to such a configuration.  See Boston Red Sox Baseball Club LP v. Sherman, 88 USPQ2d 1581, 1588 (TTAB 2008) ("Whether applicant intended the mark to be humorous, or even whether some people would actually find it to be humorous, is immaterial.  The fact remains that the term would be perceived and understood as vulgar by a substantial portion of the purchasing public.").

Applicant argues that the examining attorney has failed to consider contemporary attitudes concerning the "giving the finger" gesture depicted in applicant's mark. It is applicant's position that when the gesture is not directed to a particular individual or group it is not immoral or scandalous, and that the examining attorney has not submitted any evidence to show that the gesture is

---

[5]  We recognize that children would not be the purchasers of the alcoholic beverages identified in Class 33 of applicant's application, but they would still be exposed to applicant's product packaging mark used for alcoholic beverages displayed on supermarket shelves.

immoral or scandalous when it appears standing alone or in a vacuum.

We are not persuaded by this argument. While we recognize, as the Court pointed out in Mavety Media Group, 33 F.3d 1367, 31 USPQ2d 1923, 1926 (Fed. Cir. 1994), that there are "ever-changing social attitudes and sensitivities," the articles that are of record, and the definitions from the American Heritage Dictionary and The New Oxford American Dictionary, infra, are sufficiently contemporaneous with the examination of the subject application that they reflect contemporary viewpoints. Two of the above-quoted articles appeared in 2009 and one appeared in 2007, while the American Heritage Dictionary was initially printed in 2000 and was revised in 2006, and The New Oxford American Dictionary was printed in 2005 (applicant filed its notice of appeal on November 30, 2009).

We acknowledge that one of the definitions for "the finger," listed in Urban Dictionary, states that "2. can be a strange, friendly greeting for some. Alternative to 'hello'," although this same definition includes the statement, "why some consider this is a greeting, no-one will ever know." There are also reports in some of the articles that are of record of people making this gesture

in a film and a television program, and in a political situation.[6] However, we do not regard these limited instances as showing that the gesture is acceptable to a substantial composite of the general public. Certainly words that would be considered vulgar, and would be considered scandalous as trademarks, are used in motion pictures. As for the reports of notable people making this gesture, it appears to us that the fact that these instances of use were reported indicates that the gesture is so shocking that a celebrity making the gesture is noteworthy. Thus, when we consider the entire record, we find that the gesture depicted in applicant's mark is vulgar, and that applicant's mark comprises matter that is scandalous or immoral.[7]

---

[6] "The Finger," www.ooze.com, states that the gesture appeared in the film "Titanic" and an episode of the TV series "NYPD Blue," and that in 1976 former Vice President Nelson Rockefeller, who was heckled by protesters giving him the finger, flipped it back.

[7] In its brief applicant has relied on and quoted extensively from a non-precedential opinion of the Board, noting that this decision, which was published in 1999, was designated as "Not citable as precedent of the TTAB." At the time the decision issued practitioners were not to cite such cases to the Board. Board policy subsequently changed: such non-precedential decisions are now marked "This case is not a precedent of the TTAB." While practitioners may cite to such decisions, they are not binding on the Board. TMBP § 101.03 (3d ed. 2011). Since they have no precedential effect, the Board will generally not discuss them in other decisions. We therefore see no need to discuss that case in this opinion. We point out that, although applicant has quoted the Board's discussion of evidence that was submitted in the earlier case, that evidence is not of record

13

As for the distinction that applicant makes between the finger gesture when directed at someone, and when viewed in a vacuum, again we are not persuaded by this argument. We agree that there are some terms that can be perceived as a personal insult when directed at an individual, but would not be considered scandalous or immoral, such as applicant's example of the word "idiot." However, the evidence shows that the finger gesture that comprises applicant's mark is treated as obscene in general, not as offensive only to the person to whom it is directed. For example, the article quoted above, entitled "Why is The Middle Finger Offensive?" blurs out the gesture in the photograph because it is obviously considered to be offensive to the readers of the article, who clearly are not the object of the gesture. Similarly, in the PBS documentary the gesture of the soldier raising his middle finger at a picture of Saddam Hussein has been blurred out because it is considered offensive to the viewers of the documentary. We do not understand applicant to be taking the position that in each of these examples there is someone to whom the gesture is directed (other drivers in the first example, Saddam Hussein in the second), and that

herein, and the quotation of what the Board stated about that evidence has not been given any evidentiary weight.

distinguishes these instances from applicant's use of the gesture as a trademark. However, if that should be applicant's argument, we do not find it persuasive. Not to put too fine a point on it, the gesture depicted by applicant's mark is the visual equivalent of an extremely offensive expletive."[8] Just as these words would be considered scandalous and immoral if used as a trademark, even if it was not clear to whom the insult was directed, the visual depiction of these words by the finger gesture shown in applicant's mark is equally scandalous and immoral.

Applicant points out that a third-party application, Serial No. 77697434 for a mark containing an image of a skeletal human hand showing the middle finger elongated and

---

[8] See definitions in Urban Dictionary, www.urbandictionary.com, for "the finger": 1. means fuck you  enuff said; 2. …Eventually evolved (in America only) to mean "up yours," and later switched definitions to "F*** you"; 6. FUCK YOU, strong disapproval; 7. "The finger" refers to the middle finger, that is, the third finger from either side of your hand.  When it is raised on its own and pointed at someone, it means "fuck you," or similar….
We also take judicial notice of the meaning of the phrase "give someone the finger," in The New Oxford American Dictionary, 2d ed. 2005: *informal* make an obscene gesture with the middle finger raised as a sign of contempt, meaning "fuck you."  That dictionary's definition of "fuck," of which we take judicial notice, states under Usage, "Despite the wideness and proliferation of its use in many sections of society, the word fuck remains (and has been for centuries) one of the most taboo words in English.  Until relatively recently, it rarely appeared in print; even today, there are a number of euphemistic ways of referring to it in speech and writing, e.g., the F-word, f***, or f--k."

the other fingers curled, was approved for publication

without a refusal under Section 2(a) having been raised.

Countering this, the examining attorney has submitted

numerous third-party applications for marks containing a

depiction of this gesture which were abandoned, presumably

because registration was refused on the ground that the

marks were scandalous, although the Office actions that

issued in the applications were not submitted. There is no

need to discuss this "battle of the applications," as they

have no probative effect. Third-party applications are

evidence only of the fact that they have been filed.

Interpayment Services Ltd. v. Docters & Thiede, 66 USPQ2d

1463, 1468 n.6 (TTAB 2003). In any event, we note that,

subsequent to applicant's making the file of application

Serial No. 77697434 of record, this application was

opposed, and the opposition, which was brought on grounds

including that the mark was scandalous or immoral, was

sustained.[9]

In summary, we find that the Office has met its burden

of showing that the applied-for mark comprises matter that

would be regarded as vulgar by a substantial composite of

---

[9] The opposition was sustained because the applicant abandoned its application without the opposer's consent, so there was not a full trial or a decision on the merits.

the general public, and therefore the mark is scandalous or immoral.

Decision:  The refusal of registration is affirmed.